UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6197-CR-FERGUSON

UNITED STATES OF AMERICA,          :

    Plaintiff,                     :

v.                                 :

FRANCISCO PEREZ,                   :

    Defendant.                     :

_____

FILED by ___ D.C.
NOV 3 0 2000
CLARENCE MADDOX
CLERK U.S. DIST. CT.
S. D. OF FLA. FT. LAUD.

**REPORT AND RECOMMENDATION**

THIS CAUSE is before the Court on the defendant's Motion to Suppress Evidence and Statements (DE 18), which was referred to United States Magistrate Judge, Lurana S. Snow, for report and recommendation. The defendant seeks to suppress evidence seized during a warrantless search of his baggage and person at the Fort Lauderdale International Airport on July 12, 2000, and statements made by him immediately following that search. An evidentiary hearing was held on this motion on October 16, 2000.

I. FACTS PRESENTED

Broward County Sheriff's Office (BSO) Detective Jose Interian testified that he is a member of Broward County Domestic Interdiction Unit, and was assigned to cover the Fort Lauderdale airport on July 12, 2000. Detective Interian, who was dressed in civilian clothes, observed the defendant as he entered the airport through the middle door. Detective Interian stated that the

defendant stopped as soon as he came through the door and turned around in a full circle. According to Detective Interian, the defendant's eyes were wide open and he appeared to be nervous and looking for someone. The defendant was wearing a Hawaiian shirt that was not tucked into his pants.

Detective Interian stated that the defendant got in line at the Spirit Airlines counter and again looked around with his eyes wide. The defendant pulled down his shirt and looked at it, as if to see whether anything was protruding. Detective Interian recalled that the defendant did this about five times while waiting in line. Detective Interian and his partner, Detective Wolfkill, were standing to the left of the defendant.

Detective Interian related that after the defendant had obtained his boarding pass, Detective Wolfkill attempted to speak to him, but was not able to communicate. Detective Interian then spoke to the defendant in Spanish, which Detective Interian speaks fluently. Detective Interian identified himself as a police officer and asked the defendant for consent to search his bag and his person, which the defendant gave.

Detective Interian then informed Detective Wolfkill that the defendant he had obtained consent, and Detective Wolfkill began to search the defendant's luggage. Detective Interian then asked the defendant if the bag belonged to him, if anyone had asked him to carry anything and if he was carrying any wrapped items. Detective Interian advised the defendant that he was looking for

contraband, and added that some people carry it their bags, while others strap it to their bodies. According to Detective Interian, at this point the defendant appeared to become very nervous: his carotid artery throbbed visibly and the defendant was not making eye contact with the detective.[1]

Detective Interian began his search of the defendant's person in the groin area. He immediately felt several hard pellets that were the size of a finger. Detective Interian had felt such objects before, and stated that they always were either heroin or cocaine. Detective Interian said to the defendant, "You have drugs - is it heroin or cocaine?" The defendant responded, "Heroin." Later the detective obtained permission from the defendant to remove the drugs.

Detective Interian then advised the defendant of his <u>Miranda</u> rights by reading from a form. The defendant acknowledged that he understood his rights and agreed to waive them. The rights form was signed by Detective Interian and Detective Wolfkill. The defendant then provided a detailed statement regarding his involvement in the offense charged in the instant indictment.

On cross examination, Detective Interian testified that when the defendant entered the airport terminal, Detective Interian

---

[1] Detective Interian stated that when he first encountered the defendant, he asked the defendant what he was doing in Florida. The defendant replied that he had come from New York to take care of debts, and later said that the debts were in Orlando. It was at this point that the defendant began avoiding eye contact.

3

was standing at the Spirit counter, about forty feet from the door. The defendant walked straight toward the counter, and stood in line for about ten minutes before he got his boarding pass. Detective Interian conceded that Spirit flies to destinations other than New York. Detective Interian denied receiving any tips regarding the defendant, but did not recall focusing on anyone other than the defendant that day.

Detective Interian stated that he was standing about five feet from the defendant when the defendant reached the ticket counter. The detective began speaking to the defendant before he finished his business at the counter. Then the defendant walked away, and Detective Interian and Detective Wolfkill followed behind and continued talking to him.

Detective Interian conceded that he had no specific suspicion that the defendant possessed a gun, and that when he felt the object in the defendant's groin he knew that it was not a gun. He also acknowledged that at the time the defendant was told that he had drugs, the defendant was not free to leave. Finally, Detective Interian admitted that neither he nor his partner ever advised the defendant that he did not have to speak to them and did not have to consent to any search.

Hollywood Police Detective Robert Wolfkill testified that he is a member of the South Broward Drug Interdiction Unit. He stated that currently large amounts of heroin are being transported to New York through Fort Lauderdale, and that he picked the

4

defendant's flight because it was direct to New York. Detective Wolfkill related that the defendant adjusted his shirt and looked at his groin area several times. The detective testified that there is no profile for domestic couriers, and the fact that the defendant was a Latin male was not important.

The defendant testified on his own behalf, stating that when he entered the airport on July 12, 2000, he had to walk about four steps (three meters) to get to the line for his flight. He had with him a carry-on suitcase on wheels. The defendant stated that he was not looking around because he went right to the line, where he stood for about fifteen minutes. The defendant denied pulling his shirt down while in line, as he had no reason to do so.

The defendant recalled that one of the police officers (Detective Wolfkill) was waiting for him at the ticket counter. As soon as the defendant handed over his ticket, and before the defendant became engaged with the woman at the counter, the officer brought out his badge. When the Cuban officer (Detective Interian) joined them, he asked the defendant when he had arrived. The defendant replied, "Yesterday." Detective Interian then asked why, and the defendant replied that he was there to pay a debt at a resort.

At that point, the woman at the ticket began asking questions, and Detective Interian translated them. Detective Interian then inquired about the name of the resort, and the defendant explained that it was a time share in Orlando that he was

5

paying for monthly. Detective Interian asked if the defendant had traveled to Orlando. The defendant responded that he was there to talk to a friend about making payments through the friend's bank account, which was cheaper than using a credit card.

The officers then told the defendant that they should go to a place on the side of the ticket counter. Detective Wolfkill carried the defendant's suitcase, while Detective Interian asked the defendant if there was anything illegal inside. The defendant said there was not, but Detective Wolfkill already had opened the bag. Detective Interian then touched the defendant's groin and announced that the defendant was carrying drugs in there. The defendant said, "Sorry," after which he was handcuffed and moved into a room, where his shirt was lifted and photographs were taken.

According to the defendant, neither officer asked him for permission to search the suitcase or his person. Detective Interian told the defendant not to lie, that if he did the detective would not help him at all. Detective Interian repeatedly asked the defendant whether he was called by any other name, and mentioned the name "Sergio." The officers looked at the defendant's body to see if he had any tatoos, and showed the defendant a photograph of a black man and asked if the defendant knew him. The detectives stated that they had arrested the man in the photograph the previous day, and added that the man was wearing clothing similar to that of the defendant.

6

II. RECOMMENDATIONS OF LAW

The defendant contends that he was unlawfully detained by the officers and that he did not voluntarily consent to the search of his person. He asks that the evidence obtained as a result of the improper seizure and search of his person be suppressed, and that his post-arrest statements likewise be suppressed as fruit of the poisonous tree. The defendant does not raise a Miranda issue and concedes that if the search and seizure were lawful, his statements are admissible.

The Supreme Court has held that police officers may approach individuals at random in airport lobbies and other public places to ask questions and to request consent to search their luggage, as long as a reasonable person would understand that he or she could refuse to cooperate. Florida v. Royer, 460 U.S. 491, 502 (1983); United States v. Mendenhall, 446 U.S. 544, 554 (1980). If, by physical force or show of authority, a reasonable citizen would not believe that he is free to ignore police questioning and go about his business, he has been unconstitutionally seized. Florida v. Bostick, 501 U.S. 429, 439 (1991); Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968). Even a minimal curtailment of an individual's liberty must be based on a reasonable and articulable suspicion that the person is engaged in criminal activity. Reid v. Georgia, 448 U.S. 438, 440 (1980).

In Reid, a DEA agent at the Atlanta airport noticed two men who appeared to be trying to conceal the fact that they were

travelling together. The agent approached the men outside the terminal building. He identified himself as a federal narcotics agent, and asked the two men to show him their airline ticket stubs and identification, which they did. The tickets reflected that the suspects had stayed in Florida only one day, and the agent believed both men appeared to be nervous. The agent asked them if they would return to the terminal to consent to a search of their persons and shoulder bags. One man nodded his head, and the other responded, "Yeah, okay." As they entered the terminal, one of the men began to run and abandoned his shoulder bag. Id. at 439.

The Supreme Court held as a matter of law that the agent could not have reasonably suspected the men of engaging in criminal activity. The fact that one of the two men walked in front of the other and occasionally looked back at him did not indicate any wrongdoing, and "the other circumstances describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." Id. at 441. The agent's inchoate and unparticularized suspicion or hunch was insufficient to support the seizure of the suspects. Id., quoting Terry v. Ohio, 392 U.S. at 27.

In the instant case, the police officers observed the defendant enter a Fort Lauderdale airport terminal, look around him with his eyes open wide and get in line for a flight to New York. On a few occasions while in line, the defendant pulled down on his

8

shirt and looked in the direction of his groin area as he did so. Based on the analysis employed in Reid, supra, the two detectives lacked any reasonable suspect that the defendant was engaged in criminal activitiy. Nevertheless, the detectives identified themselves as police officers and began questioning the defendant while he was still transacting his business at the ticket counter. It is doubtful that a reasonable person in the defendant's position would think he had a choice to ignore the police presence, since "[m]ost citizens, we hope, believe that it is their duty to cooperate with the police." United States v. Washington, 151 F.3d 1354, 1357 (11th Cir. 1998).

According to Detective Interian, he began by asking the same questions routinely posed by airport employees prior to boarding: whether the defendant everything in the defendant's luggage belonged to him and whether anyone had asked him to carry anything. He then told the defendant that he was looking for contraband and asked for consent to search the defendant's suitcase and his person. As soon as the defendant acquiesced, Detective Interian began a search of the defendant's groin area. Detective Interian stated that he had no reason to believe that the defendant was concealing a firearm.

Clearly the detectives initiated their encounter with a show of authority, and at no time advised the defendant that he was free to ignore their questions or refuse consent to search. While the failure to advise a suspect of his right to refuse consent does

9

not, in and of itself, render consent involuntary, it may be an important factor to be considered by a reviewing court. United States v. Guapi, 144 F.3d 1393, 1395 (11th Cir. 1998). In Guapi, as in the instant case, a typical passenger would not feel free to refuse the requests, but could consider them to be orders. And, as the Guapi court noted, it seems obvious that if police officers genuinely want to ensure that their encounters with passengers remain absolutely voluntary, they can simply say so. Id. at 1357. See also, United States v. Drayton, 2000 WL 1584545 (11th Cir. (Fla.)), October 24, 2000.

At the hearing, the prosecutor also suggested that the evidence be admitted as the product of a border search. This argument is frivolous, since the police officers had no reason to believe that the defendant had crossed a border prior to the search. United States v. Hill, 939 F.2d 934, 937 (11th Cir. 1991), citing United States v. Santiago, 837 F.2d 1545, 1548 (11th Cir. 1988); United States v. Garcia, 672 F.2d 1349, 1364 (11th Cir. 1982).

### III. CONCLUSION

The Government has failed to demonstrate that the police had a reasonable suspicion that the defendant was engaged in criminal activity, and his detention for questioning was not lawful. In addition, the Government has not met its burden of proving that the defendant's consent to the search of his person and luggage was voluntarily given. Accordingly, it is

10

RECOMMENDED that the defendant's Motion to Suppress be GRANTED, and the evidence and statements taken from him be excluded from admission at trial.

The parties will have ten days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with The Honorable Wilkie D. Ferguson, United States District Judge. Failure to file objections timely shall bar the parties from attacking on appeal factual findings contained herein. LoConte v. Dugger, 847 F.2d 745 (11th Cir. 1998), cert. denied, 488 U.S. 958 (1988); RTC v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 30th day of November, 2000.

LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:

AUSA Tom Lanigan (FTL)
AFPD Martin Bidwill (WPB)

11